UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL E. PERRY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:10-cv-00477-JAW |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDED DECISION

The Social Security Administration found that Michael E. Perry, a former chef in his

fifties, has severe impairments, but retains the functional capacity to perform substantial gainful

activity in occupations existing in significant numbers in the national economy, resulting in a

denial of Perry's application for disability insurance and supplemental security income benefits

under Title II and Title XVI of the Social Security Act.  Perry commenced this civil action to

obtain judicial review of the final administrative decision.  I recommend that the Court affirm the

administrative decision.

### The Administrative Findings

The Commissioner's final decision is the August 4, 2010, decision of Administrative Law

Judge John F. Edwards because the Decision Review Board did not complete its review during

the time allowed.   Judge Edwards's decision tracks the familiar five-step sequential evaluation

process for analyzing social security disability claims.  (Docs. Related to Admin. Process, Doc.

No. 8-2, R. 1, 8-18.[1])

At step 1 of the sequential evaluation process, the Judge found that Perry met the insured

---

[1]     The Commissioner has consecutively paginated the entire administrative record ("R."), which has been
filed on the Court's electronic docket in a series of attachments to docket entry 8.

status requirements of Title II through December 31, 2009, and has not engaged in substantial gainful activity since July 28, 2006, the date of alleged onset of disability.  (R. 10, Findings 1 & 2.)

At step 2, the Judge found that Perry has the following severe physical/mental impairments:  left hand derangement and degenerative disk disease post L4-L5 discectomy with complaints of residual pain.  (R. 10, Finding 3.)   The Judge found that allegations of depression and right shoulder impairment were not medically determinable.  (R. 11.)

At step 3, the Judge found that this combination of impairments would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P.  (R. 12, Finding 4.)

Preliminary to further evaluation at steps 4 and 5, the Judge assessed Perry's residual functional capacity.  The Judge found that Perry's combined impairments result in a capacity for less than the full range of light work, an ability to sit, stand, or walk for up to six hours in an eight-hour workday, subject to having an ability to stretch for two minutes every hour between normal breaks, and limitations to only occasional climbing of ramps and stairs and no use of ladders, ropes or scaffolds.  Additionally, Perry should avoid forceful pushing with the left lower extremity, can reach frequently in all directions, can handle and/or finger frequently with the right hand but only occasionally with the left and without any fine precision work with the left, non-dominant hand.  Due to pain and distraction, Perry is further limited to unskilled work.  (R. 12, Finding 5.)

At step 4, the Judge found that this degree of limitation precluded past relevant work as a railroad car repairer, short order cook, and chef.  (R. 16, Finding 6.)  The Judge explained that the first job requires heavy-exertion, the second is semi-skilled, and the third is skilled and

requires medium-exertion.  (Id.)

Perry was born in 1959, has at least a high-school education, and can communicate in English.  His skill set was deemed immaterial to the vocational analysis.  (R. 16, Findings 8-9.) The Judge presented a vocational expert with this vocational profile and the residual functional capacity findings and found, based on the vocational expert's testimony, that Perry could engage in other substantial gainful employment, including in the unskilled occupations of fast-food worker, sandwich board carrier, school bus monitor, and parking lot attendant.  (R. 16-17, Finding 10.)  In light of this finding, the Judge made a determination that Perry was not disabled between the date of his alleged onset and the date of decision.  (R. 17, Finding 11.)

## Discussion of Plaintiff's Statement of Errors

Perry argues that the Judge erred, in part, because the Judge's residual functional capacity finding does not correspond with any of the multiple residual functional capacity assessments offered by the medical experts, including an expert opinion obtained by Perry's counsel shortly before the commencement of the administrative hearing.  Insofar as the Judge's findings were guided by the testimony of a consulting medical expert called at the hearing, Perry challenges the reliability of the testifying expert's opinion based on the quality of his responses to questioning, restrictions on his testimony imposed by the Judge, the fact that certain responses are recorded on the transcript as "inaudible," and the failure to address certain items customary to a physical residual functional capacity assessment.  (Statement of Errors at 5-10, Doc. No .12.)  Perry further argues that the Judge's finding that he will be able to sustain full-time work if he can stretch no more than two minutes per hour is not supported by any substantial evidence in the record.  Perry complains that the Judge could not just base this on an independent lay assessment and says that the Judge violated a "sit and squirm" rule by drawing a negative inference from

Perry's ability to remain seated for more than an hour during the administrative hearing. (Id. at 11-12.) Additionally, Perry claims that the Judge failed to adequately address, or address at all, certain residual functional capacity assessments offered by non-examining, consulting experts. (Id. at 12-13.) Finally, Perry alleges reversible error based on the failure to refer the case to another consulting expert in light of more recent medical records, including a medical source statement of ability to perform work-related activities. (Id. at 13, citing Exs. 8F, 13F, 14F.)

Other than the issues raised in relation to his spinal impairment, Perry advances three additional points of error associated with his left hand impairment, an alleged mental limitation, and an alleged right shoulder impairment, plus a fourth argument asserting the absence of any expert opinion addressed to the entire time period under consideration (other than the opinion of the consultant selected by Perry's counsel). (Id. at 13-16.)

A. The Record

Perry suffers from lumbar back pain with radiculopathy and has been in treatment with John Patten, D.O., of Penobscot Community Health Center. (Ex. 1F.) This condition is longstanding and was treated surgically in November 2004, allegedly without benefit. (R. 395.) The pre-surgery MRI report of April 2004 indicates:

> Axial images at L5-S1 show asymmetric minimal disk bulge on the right with some contact of the S1 nerve root sleeve on the right. Focal bright signal in the annulus is compatible with annular tear.
>
> At the L4-L5 level, there is a larger protrusion of disk material which contains high signal. This is on the left. There is clear-cut compression of the L5 nerve root sleeve on the left.
>
> IMPRESSION:
>
> 1. Disk protrusion L4-L5 on the left with compression of the L5 nerve root sleeve. Moderate size fragment.
>
> 2. Mild asymmetric disk protrusion, L5-Sl, right, with evidence of annular

tear.

(Ex. 9F.)  The disk protrusion at L4-L5 was addressed in the November 2004 surgery by means of a left L4-L5 discectomy.  (Ex. 10F.)  A brief narrative states that Perry had reduced pain in the left lower extremity post operatively, presumably due to decompression of the nerve.  (R. 471, 474.)  However, a follow-up note of January 2005 reports "ongoing discomfort despite surgical intervention."  (Ex. 11F, R. 482.)  A follow-up MRI report of April 2005 states:

> At L4-5, the patient is status post left laminectomy with resection of the ligamentum flavum, and there is abnormal enhancing tissue within the canal to the left of midline encasing the origin of the right L5 root from the thecal sac. There is no sign of recurrent disk extrusion and no scarring within either foramen is evident.  There is no deformity of the thecal sac.
>
> At L5-S1, there is minimal early endplate osteophyte formation and disk bulging. Note is made that there is flattening of the origin of the left S1 root from the thecal sac between the disk and facet margins.  This potentially could be clinically relevant and correlation clinically along these lines is apparent.  No other source of significant canal or foraminal encroachment at this level is apparent.  This left S1 root origin finding is unchanged compared with the prior scan.
>
> IMPRESSION:
>
> 1. Status post left L4-5 laminectomy and repair of disk extrusion with fibrosis within the canal to the left of midline encasing the origin of the left L5 root from the thecal sac.
>
> 2. No recurrent disk extrusion.
>
> 3. Persistent flattened deformity of the left S1 root origin from the thecal sac due to apparent compression between the disk and endplates and facet margins.

(Ex. 12F, R. 490.)  Post-operatively, Perry pursued a limited course of physical therapy, allegedly without benefit.

An August 15, 2005, "closure report" from Christopher Temple, M.Ed., CRC, of Temple Rehabilitative Associates states:  "When I last met with Mr. Perry on July 15, 2005 at the Career Center in Bangor, he was reporting significantly increased symptoms.  He was walking at that

time with a cane, and with a remarkably hindered gait. I would actually call it a dramatically hindered gait in that it did not appear to be realistic." (Ex. 19F, R. 653.) This report is from a vocational rehabilitation provider, not a physical therapy provider.

Perry's current application for disability benefits under the Social Security Act was submitted on April 30, 2008, alleging an onset date of July 28, 2006. In August 2008, Maine Disability Determination Services obtained a consultative examination report from Edward J. Harshman, M.D. (Ex. 2F.) Dr. Harshman considered symptoms of back pain, left leg radiculopathy, and a left hand impairment preventing the full extension of two finger joints. (R. 397.) Concerning the hand injury, Dr. Harshman described the impairment as unmistakable and assessed that there would be interference with precision work, but that a good grip remained. (R. 398.) Otherwise, Dr. Harshman's physical examination results were:

> Back impairment is not corroborated. Hip flexion against resistance, also shoulder abduction against resistance, did not elicit back-pain complaints. The claimant uses no analgesics. An operative report or a radiograph report would be useful to assess impairment, but in their absence I have to say that I could not find any in the back.
>
> He can sit, stand, walk, lift, carry, reach overhead, do power finger movements, do some with the left and all with the right hand precision finger movements, push, pull, stoop, crouch, crawl, and climb stairs and ladders. Speech and comprehension are preserved.

(R. 398.) In effect, Dr. Harshman's physical examination calls into question the severity of Perry's back symptoms and establishes the medical basis for the left-hand impairment.

Robert Hayes, D.O., supplied a physical residual functional capacity assessment in September 2008. (Ex. 3F.) His review took into consideration Dr. Harshman's report of physical examination as well as primary care records from the post-operative period, including the MRI reports. (R. 407.) In addition to assessing manipulative limitations in the left hand, Dr. Hayes assessed an exertional limitation to medium duty (50 pounds on occasion and 25 pounds

on a frequent basis); a six-hour capacity to stand/walk and a six hour capacity to sit in an eight-hour workday; and some additional postural limitations. (R. 401-403.) Dr. Hayes also indicated that Perry should avoid hazards requiring good bimanual dexterity. (R. 404.) In Dr. Hayes's view, Perry's allegations of greater limitations in standing, sitting, and walking were not entirely credible. (R. 405.)

Treatment notes from February 2009 concern subjective reports of falling over and poor balance due to occasional left leg weakness. (Ex. 4F, R. 408.) Perry's physical impairments were assessed by Donald Trumbull, M.D., in March 2009, for purposes of reconsideration. (Ex. 6F.) Dr. Trumbull's assessment largely corresponds with the assessment provided by Dr. Hayes, except that Dr. Trumbull would restrict left-hand manipulation only with respect to fingering and not with respect to handling and did not identify a risk associated with hazardous tasks requiring bimanual dexterity. (R. 419-22.) Like Dr. Hayes, Dr. Trumbull considered post-operative primary care records and related notes of physical exams, not merely Dr. Harshman's report of physical examination. (R. 425.)

Maine Disability Determination Services referred Perry for psychiatric examination by Donna Gates, Ph.D., in March 2009, evidently due to allegations of depression. (Ex. 5F.) Among many other observations noted in her report, Dr. Gates observed that Perry "left the building after the evaluation rapidly and with an unremarkable gait" and reported walking three or four miles daily, stopping and resting as he goes. (R. 415.) Dr. Gates concluded that Perry would perform adequately in areas of mental functioning required of basic work. (R. 416.) Thomas Knox, Ph.D., performed a psychiatric review technique on behalf of Maine Disability Determination Services in March 2009, taking into consideration Dr. Gates's report and one recent treatment record concerning complaints of depression. He assessed that there was no

medically determinable impairment.  (Ex. 7F, R. 427, 439.)

Between April and November 2009, Perry sought treatment from Eastern Maine Medical Center Family Medicine of Brewer, principally from Alisa Roberts, D.O., for complaints of back pain and leg pain.  This treatment primarily consisted of medication management.  (Ex. 9F.) Evaluation included a referral for an EMG/NCV Electrodiagnostic Report to "delineate neuropathic involvement."  (R. 453.)  With the exception of a potentially "nonspecific finding" involving left peroneal nerve conduction, study results were within normal limits with "no evidence of acute lumbosacral plexopathy or radiculopathy at this time."  (R. 453-54.)  An additional MRI was obtained in this course of treatment from Eastern Maine Medical Center. The impression:

> Stable epidural fibrosis at L4-L5.  Possible epidural fibrosis at L5-S1 without evidence of significant change compared to April 11, 2005.  No evidence of recurrent disk extrusion.  No active process, otherwise.

(R. 449.)

Perry's current application for disability benefits is not his first application.  There is a report of consultative examination in the record from Robert Keenan, M.D., supplied to Maine Disability Determination Services in July 2006.  (Ex. 15F.)  That report explains that Perry's symptoms of left leg weakness and tingling came on post-operatively.  (R. 502-503.)  Based on his examination, including pain on heel-to-toe, use of a cane with heel-to-toe walking, pain at the outer ends of lumbar and hip motions, pain with left leg seated raise to 85 degrees, and Perry's subjective report of symptoms, Dr. Keenan offered a medical source statement that Perry can walk for a maximum of 45 to 60 minutes with normal breaks;  stand for only 5 to 10 minutes; climb no more than three stairs;  lift at the light exertion level;  must adjust position every 10 minutes;  and would have difficulties bending and carrying.  (R. 506.)  Thereafter, Dennis

McCann, M.D., supplied a physical residual functional capacity assessment calling for a limitation to light exertion, standing or walking for two-to-three hours in an eight-hour workday subject to use of an assistive device (though it was noted that no prescription for such a device is evident), and sit for six hours so long as Perry can stand and stretch for a few minutes every hour. Additionally, Dr. McCann assessed that Perry could not constantly use his left lower extremity to push or pull. (R. 509.) Dr. McCann noted that he gave credit for allegations of back pain and that he regarded Dr. Keenan's walking and stair-climbing restrictions to be excessive in comparison to the physical findings. (R. 513-14.)

The final written expert assessments of record are those of Frank Graf, M.D., directed to Perry's counsel in April 2010. Dr. Graf reviewed Perry's medical history and conducted an orthopedic examination to identify physical problems and to assess Perry's functional restrictions and work capacity. (Ex. 13F, R. 492.) In addition to reviewing the spinal condition, Dr. Graf offered a diagnosis of "probable rotator cuff tendinitis with possible rotator cuff tear or attritional lesion." (R. 496.) Dr. Graf opined that Perry would be unable to perform his prior work as a chef or frequently carry ten pounds or less because of unpredictable falls occasioned by "residuals of left L5 spinal nerve root function" otherwise described as "residuals of laminotomy discectomy with manipulation of the L5 nerve root in the left lateral recess." (Id.) Dr. Graf otherwise opined that Perry's ongoing back pain results from "chronic scarring or epidural fibrosis at the operated level" and disc herniation at L5-S1. (Id.) As for right shoulder restrictions, Dr. Graf indicated that Perry would be limited in sustaining right shoulder functions requiring strength and shoulder-level or overhead positioning of the right hand. (R. 497.) Dr. Graf additionally completed a form medical source statement of ability to do work-related activities (physical). He assessed severe limitations, including an unqualified maximum of ten

pounds lifting, less than two hours of standing and/or walking in a workday, ability to sit subject to having freedom to alternate position to relieve pain or discomfort, and a limitation related to pushing and/or pulling in the upper extremities. In addition, Dr. Graf assessed certain postural, manipulative, and environmental restrictions and an attention/concentration limitation due to pain. (R. 498-501.)

In addition to these written assessments, the Judge obtained testimony from a medical expert, Peter Webber, M.D., at Perry's July 2010 hearing.[2] Dr. Webber questioned Perry concerning his report of left leg numbness and based on Perry's report of numbness over the entire leg, found it difficult to explain "on a functional basis." (R. 48.) Dr. Webber also indicated that Dr. Harshman had expressed difficulty assessing a "definitive severe lower extremity limitation" despite examination and noted that the EMG report indicated no evidence of radiculopathy. (R. 48-49.) As for the left hand impairment, Dr. Webber predicted difficulty with fine handling, fingering, or manipulative work using the upper extremities and a restriction to light work due to reduced grip strength. Dr. Webber did not believe a shoulder restriction was evident. As for the back complaints, Dr. Webber believed there remained a capacity for light work because Perry can walk, sit, and stand "for some periods of time." (R. 50.) Otherwise, Dr. Webber thought work involving foot controls should be ruled out and that there would be "some concern about" balance, ladders, and similar hazards, and some limitations involving bending and twisting, but not enough to rule out light activity. (Id.) Dr. Webber reviewed Dr. Graf's reported examination findings and opined that they did not support Dr. Graf's assessment that Perry has less than a sedentary work-capacity. (R. 52.) Counsel asked whether Dr. Keenan's assessment had been considered and Dr. Webber explained that Dr. Keenan's assessment was

---

[2]    The claim originally came on for hearing in April 2010, but it became apparent that the record was not complete and the Judge continued the hearing. (R. at 97-102.)

more severe than what was presently suggested by Perry's testimony and that he could not see the evidentiary basis for how Keenan assessed an inability to negotiate stairs.  (R. 56.)  As for Dr. Graf's assessment that manipulation of the nerve root during surgery or residual fibrosis would explain the alleged symptoms, Dr. Webber responded that it presented "a rather broad statement" that would be difficult to prove and seemed "argumentative" because it is very hard to know whether such things cause severe residual symptoms.  (R. 61.)  Dr. Webber did allow, however, that "facet hypertrophic changes" could be "cause for discomfort."  (R. 62.)

Finally, the Judge heard from Warren Maxim, a vocational expert.  Given the Judge's residual functional capacity finding, Mr. Maxim testified that all past relevant work would be precluded, including past work as a chef or short order cook.  (R. 70.)  However, Mr. Maxim testified that other work would be available, including work in fast food, work as a sandwich board carrier, school bus monitor, and parking lot attendant.  (R. 70-71.)  On examination by counsel, Mr. Maxim testified that a restriction to sedentary work would preclude all of these alternatives.  (R. 71.)  He further testified that a person with "unpredictable falling" would belong in the sedentary category.  (R. 73.)  Additionally, Mr. Maxim testified that the fast food position would require constant handling and frequent fingering.  (R. 75.)

## B.  Discussion

Perry's overarching challenge to the Judge's decision is that the Judge's residual functional capacity finding is not supported by substantial evidence, in part because it does not fully align with any one expert's residual functional capacity assessment.  As a general proposition, this is not a persuasive argument.  The Commissioner is tasked specifically to take and consider medical evidence and to resolve conflicts in the evidence.  So long as his resolution of conflicts is one that a reasonable mind could accept as adequate, the Court must uphold the

decision.  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

This Court has repeatedly recognized that the Commissioner may selectively draw upon portions

of the expert opinions of record without adopting one expert's opinion *in toto*.  See, e.g., Kaylor

v. Astrue, No. 2:10-cv-33-GZS, 2010 U.S. Dist. Lexis 138855, *10, 2010 WL 5776375, *4 (D.

Me. Dec. 30, 2010) (recommended decision, adopted over objection, Feb. 7, 2011) ("[A]n

administrative law judge may pick and choose among portions of expert opinions.")  This is in

accordance with First Circuit law.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d

136, 144 (1st Cir.1987) ("[T]he notion that there must always be some super-evaluator, a single

physician who gives the factfinder an overview of the entire case—is unsupported by the

statutory scheme, or by the caselaw, or by common sense, for that matter.").  For reasons that

follow, I conclude that the Commissioner's residual functional capacity finding and step 5

finding are supported by substantial evidence.  The discussion first treats Perry's arguments

associated with his spinal condition and then turns to the other impairments of record.

*1.    Spinal impairment*

The most significant disputed aspects of the Commissioner's residual functional capacity

finding pertain to the decision that Perry can engage in light exertional activity, that he can both

sit and stand for up to six hours, and that he only needs to stretch one or two minutes every hour

between normal breaks.  Light work entails lifting no more than 20 pounds at a time with

frequent lifting of up to 10 pounds.  It also entails "a good deal of walking or standing."  20

C.F.R. §§ 404.1567(b), 416.967(b).  The Commissioner found that Perry's spinal condition does

not prevent him from engaging in light exertion or from spending six hours of an eight-hour day

on his feet based on Dr. Webber's testimony, objective medical evidence suggesting the absence

of neuropathic impairment, and an assessment that Perry's allegations of more severe limitation

were not credible based on past deceitful criminal conduct, a professed ability to walk appreciable distances and engage in a variety of activities of daily living, inconsistent representations concerning allegations of spontaneous falling, and a vocational therapist's observation that Perry's ambulation in public on one occasion was so dramatic as to appear unbelievable. (R. 13-15.) This body of evidence is suggestive that Perry has overstated his degree of impairment and that a capacity for substantial gainful activity exists. More specifically, this evidence is substantial evidence that Perry retains a capacity for light work.

Dr. Webber's opinion testimony, the consulting expert opinions of Dr. Hayes and Dr. Trumbull, and the findings of Dr. Harshman upon physical examination, all support the finding that Perry can engage in light exertion and stand/walk for up to six hours in an eight-hour workday. Moreover, Perry's self-reported level of functioning, including his level of walking activity and his activities of daily living, tends to support the Commissioner's finding. The record also supplies an adequate basis for rejecting the assertion that periodic numbness in the left leg presents a falling hazard. Dr. Webber's testimony and some of the objective evidence (the EMG study) justify a skeptical assessment regarding the existence of severe radiculopathy and Perry's own testimony (R. 45-47) suggests that this lower extremity symptom arises infrequently from walking for more than an hour and goes away on its own, without any need to stretch or sit.

Perry contends that Dr. Graf's opinion is more reliable because, unlike Dr. Webber, Dr. Graf looked at the actual MRI images and did not merely review the MRI reports. However, weighed against the images are the physical examination findings offered by Dr. Graf and those offered by Dr. Harshman. According to Dr. Webber, Dr. Graf's reported findings upon examination are not suggestive of a restriction to less than sedentary work. (R. 52.) The

Harshman findings also weigh in favor of the Commissioner's finding. For example, one of the experts who offered the stand and stretch assessment, Dr. Trumbull, did so in the context of a less optimistic assessment in 2006 in the context of a prior application. In the context of the instant application, in 2009, Dr. Trumbull reviewed updated evidence, including Dr. Harshman's physical examination findings, and concluded that Perry's allegations of back-related symptoms were less credible in light of that examination, so much so that Dr. Trumbull assessed a capacity for *medium* exertion. (Ex. 6F, R. 419, 424.) Dr. Trumbull's more recent assessment does not call for any sit/stand adjustment or for a need to stand and stretch and tends to render the earlier opinion obsolete.[3] As for other evidentiary sources, the treatment providers of record have not offered an opinion that Perry would have to stand and stretch if he sat for more than one hour continuously. Even Dr. Graf,[4] who assessed only a sedentary work capacity, did not suggest a need to stand and stretch on an hourly basis. He did assess that Perry would need to alternate between sitting and standing "periodically" (R. 499), but he did not indicate the actual frequency of such need or describe a need to "stand and stretch" for any duration.

Perry argues that Dr. Webber's testimony fails to support a finding that Perry can be on his feet for six hours. Perry notes that Dr. Webber testified, vaguely, that Perry can sit or stand "for periods of time." (Statement of Errors at 8, citing R. 52.) This language is certainly imprecise. However, in the context of that very comment, Dr. Webber also testified: "As far as the complaints of his low back, I think he could tolerate what would be, I believe would be light work." (R. 50.) This regulatory reference to light work, the Hayes physical residual functional capacity assessment (Ex. 3F), and the second Trumbull physical residual functional capacity

---

[3] This shift in opinion subsequent to Dr. Harshman's physical examination logically explains why the Judge did not rely on the residual functional capacity assessments developed before that date, including the assessment offered by Dr. McCann in the context of the prior application.

[4] Dr. Graf is not a treatment provider, though he did conduct a physical examination.

assessment (Ex. 6F) supply substantial evidence in support of the six-hour metric on standing/walking.[5]

Perry says that the Commissioner's residual functional capacity finding lacks any evidentiary basis, however, insofar as the Judge found that he would need to stretch for "one or two" minutes every hour between normal breaks. (Statement of Errors at 11-12.) On this point, there is evidence from consulting examiners who opined in 2006 that Perry would need to "stand and stretch for a few minutes" every hour (Ex. 17F, R. 509, 526), but these assessments were also offered in the context of assessments that Perry would only be able to stand between two and three hours per workday and, therefore, would be spending most of his work day seated. That has not been the operative view of the Commissioner's consulting experts ever since Dr. Harshman's 2008 physical examination. Nevertheless, Perry insists that the Judge erred because she has changed an assessment involving "a few minutes" of stretching to a finding involving "one or two minutes." By all appearances, the Judge proposed the stand and stretch restriction to the vocational expert for the sake of argument. Notwithstanding this additional limitation, the vocational expert identified multiple occupations in which Perry could stand and stretch, assuming he needed to remain seated for an hour. The difference between two minutes and "a few" minutes was not explored by Perry's hearing representative and it does not appear reasonable to demand that the Commissioner iron out that difference in the context of light-exertion occupations that would have Perry on his feet as often as not. For instance, Perry's

---

[5]      Perry argues that Dr. Webber's hearing testimony does not rise to the level of an expert residual functional capacity assessment because he did not offer precise findings on every subcategory contained in a form approved for residual functional capacity assessment and because he used some terminology such as "precision work" in the place of terms of art such as "fine manipulation" and inexact language such as "for periods of time" rather than for a duration measured by a specific number of hours. (Statement of Errors at 7-9.) Such criticisms might be sufficient in some contexts to take the persuasive force out of a testifying expert's opinions, but in this case the Commissioner has reasonably relied on Dr. Webber's testimony in the context of a record providing multiple divergent opinions in order to ascertain which guideposts offered by the consulting experts contain the most reliable assessments of the objective evidence and how Perry's subjective allegations correspond with the objective evidence. In other words, Dr. Hayes's and Dr. Trumbull's assessments supply contour to Dr. Webber's testimony.

hearing representative elicited testimony that these jobs would likely be unavailable to someone having only a sedentary capacity. (R. 71.) This fact tends to demonstrate that the jobs in question would have Perry on his feet through much of the day. A reasonable person might well be satisfied with the Commissioner's treatment of the record in regard to this particular assessment involving standing and stretching. The Judge adequately specified that the vocational expert should not suggest alternative occupations that would require Perry to remain seated for more than an hour without allowing him to "stand and stretch" for a minute or two. In light of the medical expert opinion (2006 residual functional capacity opinions calling for "a few" minutes versus 2008 and 2009 opinions that do not call for any stretching), I cannot see the harm in the theoretical distinction between "a few" minutes and up to two minutes.[6]

Perry also argues that Dr. Webber's testimony was incomplete because the Judge denied his representative the ability to ask additional questions about the MRI studies and was incorrect in failing to find Dr. Harshman's report unpersuasive in light of the fact that Dr. Harshman did not review any images of Perry's lumbar spine. (Statement of Errors at 9-10.) As to the weight of Dr. Harshman's finding, the significant factor lies in his assessment that Perry made no back-pain complaints despite tests involving hip flexion and shoulder abduction against resistance and his observation that Perry was not relying on analgesics to manage his pain. The MRIs are not incontrovertible proof of the severity of Perry's pain symptoms and Perry fails to identify authority for the proposition that his own expert's opinion trumps every other expert opinion because his expert looked at the images in addition to the narrative findings of the MRI

---

[6] The Judge indicated that she observed Perry to sit through more than an hour-long hearing. (R. 14.) I do not consider this to be a particularly weighty fact. Perry requests a legal ruling that this observation violates a "sit and squirm" rule (Statement of Errors at 11 n.8, citing cases), but I am not persuaded that the Commissioner's decision rises or falls on this observation by the Judge.

provider.[7]

Finally, as to his back impairment, Perry says there is error in the failure to refer the case to another consulting expert in light of more recent medical records, including a medical source statement of ability to perform work-related activities. (Id. at 13, citing Exs. 8F (Eastern Maine Medical Center Family Medicine of Brewer), 13F (Dr. Graf's examination report), 14F (Dr. Graf's source statement).) However, Dr. Webber's hearing testimony was offered in light of the longitudinal record and adequately addressed Dr. Graf's medical source statement and the EMG/NCV Electrodiagnostic Report obtain by EMMC Family Medicine in June 2009.

In summary, the Judge in this case provided a sufficient explanation for why he was not embracing Dr. Graf's findings[8] and, due to a record containing a supply of expert opinions, was not in the position of having to turn exclusively to Dr. Webber to fill an evidentiary void in order

---

[7]      In Perry's view, he should have been permitted to have Dr. Webber look at the actual MRI images because Perry said he had them in his possession at the hearing. (Statement of Errors at 9 n.5.) Perry says he was denied the opportunity and that Dr. Webber never indicated whether he would look at them. The transcript, however, indicates that Perry spoke up at the hearing and said: "I have the MRI. He can't see it?" To this, Perry's representative responded: "He can't look at it." (R. 54-55.) Thereafter, Dr. Webber indicated that the latest MRI report was "rather indefinite" about conditions at the S1 level and further testified: "And his symptom complex doesn't match that either. And that's if one, if he has an S1 symptom complex it would not manifest itself the way he describes it." (R. 55.) Perry's representative chose not to pursue Perry's request that she attempt to have Dr. Webber look at images in Perry's possession but not in the record. This challenge is neither preserved in the transcript nor developed in Perry's Statement of Errors.

[8]      In addition to other evaluative comments, the Judge explained:

> Dr. Webber opined that following his review of the record, the objective evidence of the claimant's medical conditions do[es] not demonstrably meet or equal any listing, and they consist of impairments of the left hand and lower back that impedes the ability to perform precise fingering and restricts the claimant's exertional capacity to light work with some limitation of the left lower extremity. Dr. Webber also said that he did not concur with the April 2010 evaluation of Frank Graf, M.D., since Dr. Graf's physical examination, citing negative straight leg raising to 60 degrees, symmetric lower extremity reflexes and no sensory pattern changes, neither indicates that the claimant has a less than sedentary exertional capacity, nor that these impairments meet listing 1.04 as Dr. Graf states, where the June 2009 MRI did not establish nerve root impairment at L5-S1 (Exs. 13F, 14F). Dr. Webber also testified that based upon the record, he did not know how Dr. Graf concluded that the claimant should never climb ramps or stairs, an opinion that the undersigned shares in light of the fact that Mr. Perry has a set of stairs in his home that he climbs consistently. As a highly qualified physician who is well versed in Social Security disability regulations and evaluation, and since his assessment is consistent with the longitudinal record, the undersigned is guided by Dr. Webber's testimony.

(R. 15.)

17

to render a residual functional capacity finding. It is well established that the Commissioner may assign greater weight to the opinions of his own experts than to those of treating physicians or claimant-chosen, examining consultants, <u>Keating v. Sec'y of Health and Human Servs.</u>, 848 F.2d 271, 276 (1st Cir. 1988) (per curiam), and the explanation provided by the Judge satisfied the Commissioner's burden of identifying substantial evidentiary grounds for decision. Perry's further argument that the transcript prevents a meaningful review of Dr. Webber's testimony (Statement of Errors at 9) is not borne out upon review.

2.     *Other impairments*

Other than the issues raised in relation to his spinal impairment, Perry advances three additional points of error associated with his left hand impairment, maintaining attention and concentration, and right shoulder impairment, plus a fourth argument asserting the absence of any expert opinion addressed to the entire time period under consideration (other than, allegedly, the opinion of Dr. Graf). (Id. at 13-16.)

a.     Upper extremities

Perry argues that restrictions he experiences due to longstanding hand injuries and alleged shoulder tendinitis of more recent vintage did not result in proper restrictions in the Commissioner's residual functional capacity assessment. The Judge found that Perry's impairment of his left, non-dominant hand limits him to handling and/or fingering with the left hand only occasionally, without any fine precision work with the left, non-dominant hand. (R. 12.) The record bears this out. Dr. Harshman reported on physical examination that Perry's left hand has shortened tendons due to past injuries and that "passive extension and active flexion are consistent with a good grip, though they do interfere with precision work." (R. 398.) Following this examination report, Dr. Hayes assessed manipulative limitations in handling and fingering.

In his words, Perry should "avoid left hand fingering and frequent handling." (R. 403.) Dr. Trumbull, on the other hand, assessed that Perry was precluded only from "constant fingering." (R. 421.) Dr. Graf, on the other hand, assessed that Perry could occasionally do either activity (handling or fingering). (R. 500.) Finally, Dr. Webber testified that Perry would have difficulty with fine handling, fingering, or manipulative work. (R. 50.) In light of the vocational expert's testimony (R. 75), the Judge should not have included fast food worker as an alternative occupation because it calls for constant handling and fingering. However, in the absence of a showing how any of the multiple assessments related to manipulative limitations would rule out the three other occupations identified by the vocational expert, reversal is not called for on the basis of this challenge.

As for the right shoulder, Perry argues that the Commissioner violated Ruling 82-52[9] because there was never an inquiry into the issue of whether his shoulder condition would likely persist for 12 months or longer. (Statement of Errors at 15-16.) Perry notes that the Judge did not explore this topic with Dr. Webber during the hearing, though Dr. Webber did testify that he did not believe a shoulder impairment was evident. (R. 50.) It bears mentioning that Perry did not advance his allegations of shoulder impairment at the hearing. The Judge concluded that this condition was not medically determinable in light of the fact that there is no objective evidence in support of "probable rotator cuff tendinitis" being a severe impairment. (R. 11.) The Judge further concluded that it was not established to have existed for 12 months or longer, first appearing in April 2009. It would have been better for the Judge to run this issue to ground with Dr. Webber at the hearing. After all, Dr. Graf offered a source statement that included a newly

---

[9]     Ruling 82-52 calls for the Administration to project whether an impairment will endure for 12 months or longer "when the application is being adjudicated (or a hearing decision is being issued) before the impairment has lasted 12 months." 1982 SSR Lexis 19, *6, 1982 WL 31376, *2. The bases for making this determination are "the nature of the impairment, the therapeutic history, and the prescribed treatment." Id.

identified condition. However, because the tendinitis first appeared with Dr. Graf's examination and has no other life in the longitudinal medical records, I find no reversible error in this regard. In particular, I note that there are over six months of treatment records from EMMC Family Medicine in Brewer that post-date the Graf examination, yet none mentions shoulder pain as a treatment concern or as something even discussed during an office visit. (Ex. 8F.) On this ground, the Judge's finding is sustainable. This assessment of the medical records is within the scope of permissible lay inference. Buttressing this approach is the fact that Perry made no mention of ongoing shoulder pain when recounting his physical condition during the hearing. (R. 31-39.) Dr. Webber's testimony that the condition is not evident supplies additional support for this outcome.

   b.  Mental limitation secondary to pain

   Perry argues that the Commissioner must find him to have a severe impairment in his ability to concentrate because Dr. Graf opined that such a limitation would exist secondary to back and shoulder pain. (Statement of Errors at 14, citing R. 500.) According to Perry, the Commissioner must accept Dr. Graf's opinion because no other expert of record offered a contrary opinion. (Id.) It is not that simple. Allegations of decreased concentration on account of pain symptoms are appropriately addressed in the context of a credibility assessment. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). When it comes to judging the credibility of a claimant's subjective report of pain, an administrative law judge's discretion is considerable. "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965). The administrative law judge is assigned the task of making the credibility determination, 20 C.F.R. §§ 404.1529(a), (c)(1), (c)(4), 416.929(a), (c)(1), (c)(4), and in doing so

he or she has leeway to consider what the "entire case record" reveals and what reasonable inferences it supports. Id.; see also SSR 96-7p, 1996 SSR LEXIS 4 at *6, 1996 WL 374186, *2 (July 2, 1996) ("[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."). Dr. Graf's opinion that concentration or attention would be significantly compromised by pain is, therefore, not controlling and does not require a restriction to simple work, as Perry proposes. The Judge's overall utilization of the record, already discussed at length, and the unfavorable credibility assessment are such that a reasonable person might accept the Judge's conclusion that Perry has failed to reliably prove pain symptoms so severe as to preclude the performance of all work tasks other than simple tasks.

3.      *A comprehensive overview*

Lastly, Perry argues that the only medical opinion of substantial weight is the one offered by his consultant, Dr. Graf, because only Dr. Graf has offered a residual functional capacity assessment that covers the entire period from July 28, 2006, forward. (Statement of Errors at 15.) For example, says Perry, many consulting expert opinions are "limited to a current evaluation as of the date rendered." (Id.) According to Perry, this shortcoming prevents the opinions in question from supplying substantial evidence based (presumably) on the passage of time. (Id.) In effect, Dr. Graf's opinion rises to the top because it is the last opinion of record. Taken to its logical conclusion, this argument would require the Commissioner to call a medical expert to every hearing regardless of whether significant developments are demonstrated by the medical records. Neither of the authorities offered by Perry, Rosado v. Secretary of Health and

Human Services, 807 F.2d 292, 294 (1st Cir. 1986), and this Court's 2010 decision in Staples v. Astrue, No. 09-cv-440-P-GZS, supports the idea. Moreover, this is not a case involving a significant medical development. With the exception of the isolated allegation of shoulder pain previously discussed, the nature of Perry's impairments and his allegations concerning his symptoms did not appreciably change between the alleged onset date and the date of decision.

### Conclusion

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court affirm the Commissioner's final decision and enter judgment in favor of the Commissioner.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 13, 2011